IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Mesfin Ketema, | ) | Civil Action No. 3:02-0502-JFA-JRM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Midwest Stamping, Inc., Terry Judy, | ) | **REPORT AND RECOMMENDATION** |
| Tedd Baldwin, and Cynthia Thompson, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff, Mesfin Ketema ("Ketema"), filed this action through counsel on February 14, 2002.[1] He alleges that his former employer, Midwest Stamping, Inc. ("Midwest"), discriminated against him due to his race (black) and his national origin (Ethiopian) in violation of Title VII.[2] Ketema also states a Title VII retaliation claim against Midwest as well as pendent claims for breach of contract and breach of an implied covenant of good faith and fair dealing. Last, Ketema asserts a defamation claim against present or former Midwest employees, Terry Judy ("Judy"), Cynthia Thompson ("C. Thompson"), and Tedd Baldwin ("Baldwin").[3] Midwest, Thompson, and Judy filed a motion for summary judgment on November 24, 2004. Because Ketema is pro se, an order pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975) was issued on

---

[1]Ketema's original counsel was relieved at a hearing on August 15, 2002. In October of 2002, other attorneys appeared for plaintiff. Their motion to be relieved was granted on August 7, 2003. Ketema has been pro se since that time.

[2]Pretrial matters were automatically referred to the undersigned pursuant to Local Rule 73.02.

[3]Baldwin is represented by Kenneth R. Young, Jr. Young has moved to be relieved. A claim against defendant Kimdra Belser was dismissed on June 17, 2003.

November 29, 2004, advising Ketema of his duty to timely respond to defendants' motion with appropriate arguments and evidence.  An order granting Ketema an extension of time to respond to the summary judgment motion was granted on December 14, 2004.  He was given until March 6, 2005 to respond.  On February 24, 2005, Ketema filed a motion which included a request for an additional thirty days to respond to the motion for summary judgment.  That motion was denied  on March 9, 2005.  Ketema's motion for reconsideration was denied on March 25, 2005.

On April 4, 2005, Ketema filed a motion for a scheduling order and for a "status & impeachment hearing."  In that motion, Ketema stated that his "timely filing of February 24, 2005 [entered as docs. 168 and 169] lists sufficient materials already on record, which present questions of significant probative value…that render defendants motion for summary judgment untenable as a matter of law."  The undersigned issued an order denying Ketema's motions and noted that the above quoted language appeared to be a manifestation of Ketema's intent not to file a response, but to rely on the documents he identified as previously filed with the court.

The document to which Ketema refers [Doc. Nos. 168-169] contains the following paragraph:

> Plaintiff knows that his detailed pleadings, document 26 <u>inclusive of its attachments</u>[4] [which defense counsels seem to want to reframe and re-

---

[4]Document No. 26 is "Plaintiff's Answer to Defendants' Response to Compel Discovery." There are numerous attachments to this document which Ketema believes support his disparate treatment claim.  The attachments include: a copy of the complaint in this action (Att. 1); portions of defendants' responses to interrogatories (Att. 2 & 3); a memorandum from Ketema to C. Thompson dated July 2, 2001, discussed in detail below (Att. 4); certain statistical information (Att. 5, 16, 17 & 18); correspondence relating to discovery (Att. 6, 7, 9, & 19); two cases dealing (continued…)

argue a second time], his complete response to defendants' first set of interrogatories [which has already been made part of the Court's records in this case], witness statements submitted to defense counsels and to the Court very early in the case, his documentary showing of defendants' and their counsels' misrepresentations and false statements to both the District Court and the 4th Circuit, NAACP's unequivocal and certified confirmation of Plaintiff's claims, Plaintiff's own sworn affidavits, critical portions of defendants' deposition statements left out by defense counsels [e.g. Mrs. Brenda Kershaw's sworn affidavit which was made part of her deposition in its entirety], the unambiguous reports from Plaintiff's highly qualified medical experts that not only tie his medical condition to defendants' actions, but find no justifiable reason for his termination, the reality that defendants' motion for summary judgment was filed following illegal *ex-parte* dealings 304 days after a questionable second dispositive motion deadline set for November 19, 2004 by the Magistrate Judge, and the fact that defendants motion is filled with several self-defeating, contradictory, and false statements, which do not even touch on <u>many</u> aspects of Plaintiff's pleadings, **in totality**, provide more than sufficient grounds not only to dismiss defendants' motion, but conclude that any reasonable person would be indignant of the injustice suffered by Plaintiff this long and rule in his favor. (Emphasis in original)

The problem with Ketema's "rely on the record" approach is that he fails to specifically address Midwest's arguments and expects the Court to scour the record in hopes of finding support for his claims. This method does not comport with Fed. R. Civ. P. 56, and the notice given to Ketema in the Court's <u>Roseboro</u> order of November 29, 2004. If defendants' motion for summary judgment contains "self-defeating, contradictory and false statements," it is Ketema's responsibility

---

[4](…continued)
with disparate discipline of employees and "similarly situated employees" (Att. 10 & 11); portions of the deposition of Bradley Crawford (Att. 8 & 12); an affidavit of Tabitha Tobin (Att. 13); a summary of Ketema's performance evaluations (Att. 14); and Midwest's announcement of Ketema's resignation dated August 17, 2001. The undersigned has reviewed these attachments in their entirety and fully considered them in the preparation of this Report and Recommendation.

to point them out and provide citations to the record to support his arguments.  Ketema has failed

to address the legal arguments raised by defendants.

<u>Facts</u>

      The record in this case is voluminous, and in some respects, irrelevant and repetitive.  The

undersigned attempts to state the essential facts which are undisputed or in the light most favorable

to Ketema:

1.      Ketema is black and "a person of Ethiopian origin and descent." (Complaint, ¶ 57).

2.      He immigrated to the United States and obtained a degree from Bowling Green

      University (Pl. Dep. 16).

3.      Midwest is a minority owned business with corporate offices in Maumee, Ohio.

      The principal shareholders are Ronald L. Thompson ("R. Thompson") and his wife

      C. Thompson.  The Thompsons are African American. (R. Thompson Dep. 6-7).

4.      Additionally, R. Thompson is the CEO of Midwest (R. Thompson Dep. 11), and

      at all relevant times C. Thompson served as Vice-President of Human Resources

      for Midwest (C. Thompson Dep. 24).

5.      Other Midwest corporate officials in Ohio were Mel Rachal ("Rachal"), President,

      and, as of late 1999, Jerry Hidalgo ("Hidalgo"), Vice-President of Manufacturing.

      Both Rachal and Hidalgo are white.

6.      While a student, Ketema worked on a part-time basis for Midwest at its corporate

      offices in Ohio. (Pl. Dep. 7/16/03, p. 21).

7.      The HR Manager at Midwest's Sumter, South Carolina facility died.  Thompson

      recommended that Ketema fill the position.  At that time, Judy (white) was acting

4

plant manager.  After a meeting with Ketema, C. Thompson, and Rachal, Judy concurred with the recommendation and Ketema was hired. (C. Thompson Dep., pp. 21-29; Judy Dep., pp. 34-36; Pl. Dep. 7/16/03, pp. 21-28).

8.    At all relevant times, Judy as Plant Manager was Ketema's direct supervisor. (C. Thompson Dep., Ex. 26 ("Ex. 26"), Att. 1-B).[5]

9.    Other Midwest management employees at Sumter were Bradley Crawford ("Crawford"), Manufacturing Manager, and Tedd Baldwin ("Baldwin"), a Production Supervisor.  Both Crawford and Baldwin are white. (Id.).

10.    Initially, the relationship between Ketema and Judy was congenial.  They frequently ate lunch together and saw each other outside work (Pl. Dep. 7/16/03, p. 35-47).

11.    Ketema asserts that the relationship between him and Judy began to deteriorate after Hidalgo became Judy's supervisor in late 1999.  Judy told Ketema that Hidalgo "gives him [Judy] all these directions he [Judy] has to follow." (Id. 42).[6] However, Ketema had no information that Hidalgo directed Judy to discriminate against anyone. (Id.)

---

[5]Ex. 26 is a response to Ketema's administrative charge of discrimination.  The narrative contained therein provides a helpful chronology of events.

[6]During the deposition of July 16, 2003, Ketema expressed his subjective feelings as to why Judy's attitude changed.  Although he has no objective evidence, Ketema believed Hidalgo to be bigoted (Pl. Dep. 7/16/03, pp. 42-43, 48).  Apparently, Ketema feels that once Hidalgo became Judy's supervisor, Judy could no longer keep his innate racial prejudice in check.

12.    Ketema testified that in late 1999, after the hiring of Hidalgo, Judy began to

change:[7]

> [T]hat is when it started getting bad and getting out of hand where
> I was having more and more difficulty preventing those things from
> spilling out and affecting employees…Early 2000 is when things
> started getting out of hand.  I was still intervening and rectifying
> some things but it was becoming a chore and [Judy]…confided in
> me a lot of  it was [Hidalgo]. (Id.)

13.    Ketema does not appear to assert that Judy discriminated against him during this

period,[8] but showed racial bias in dealing with other Midwest employees.

14.    Ketema does not clearly identify African-American employees who were

discriminated against by Judy from late 1999 through November of 1999.  At a

later time (July 2, 2001), Ketema produced for C. Thompson a seven page

document referred to in the record as "the Matrix." (See Plaintiff's Answer to

Defendants' Response to Compel Discovery filed September 27, 2002, Att. 4 and

Ex. 26, Att. 8).   This appears to be a summary of Ketema's perceived

discrimination toward seven Sumter employees: Brendaw Kershaw ("Kershaw"),

Kaushik Desai ("Desai"), Simone King ("King"), Damon Belser ("Belser"), Ricza

---

[7]Midwest employees noticed a change in Ketema around the same time.  C. Thompson
stated that "[a]lthough [Ketema] was always opinionated and sometimes argumentative it did not
start to interfere with his ability to be an effective team member until November of 2000." (Ex.
26).

[8]Ketema testified, "I have never claimed that Terry Judy has racial bias against me, not
ever.  Not then.  Not now.  He viewed me as a friend, a colleague, somebody who is there to help
him.  That is the way he saw it.  So the only claim I have against him is retaliatory nature, the
retaliation."  (Id. at 36).

Harris ("Harris"),  Rachel Joe ("Joe") and Carnel Dukes ("Dukes").[9]  Only two of these employees appear to be relevant to this time period:

a.    Kershaw was the Shipping Supervisor (Ex. 26, Att. 1-B).  Judy made negative comments about her in staff meetings and excluded her from meetings.  Ketema advised Judy to establish a relationship with Kershaw and reminded him not to discuss associates' performances in public. (the Matrix).

b.    Judy questioned Joe in March of 2000 about a shipping discrepancy before notifying Ketema.  Judy decided to transfer Joe, but the move was suspended pending an investigation.  Later, Joe was incorrectly blamed for a quality problem, but the write-up was rescinded after investigation.  In September of 2000, Joe was incorrectly blamed for a short shipment.  Her write-up was rescinded after investigation.  Ketema disapproved of Judy's handling of these issues.[10]

15.    Things began to heat up during the summer of 2000.  Ketema attributed the increased tension between him and Judy to his "involvement in protected activity regarding Rachel Joe, regarding other people, and then regarding" Brenda Kershaw. (Pl. Dep. 7/16/03, p. 161).

---

[9]The undersigned assumes all of these employees are African American.

[10]Joe contacted the local chapter of the NAACP concerning her perceived mistreatment. The NAACP launched its own investigation. (Pl. Dep. 7/16/03, Ex.9, Att. 8).

16.     Ketema and Judy concur that an incident which occurred on or about June 26, 2000 damaged their relationship.[11] (Pl. Dep. 7/16/03, pp. 206-207, Judy Dep., pp. 94-95).  An employee, Willie Dean ("Dean"), had to leave work unexpectedly due to a family emergency.  Dean spoke to Ketema as he left.  Apparently the makeup request was back dated by changing the date of request by using whiteout to show an advance request.  A supervisor brought the issue to Judy's attention and he investigated.  Ketema was out of the office at the time.  When Ketema returned the next day, Judy asked him about it.  Ketema became "irate" as he felt Judy was investigating him.  Ketema told Judy that the only reason he (Judy) was investigating the Dean incident was because Baldwin had earlier been disciplined for the same offense and that, therefore, Judy was attempting to retaliate against him (Ketema) (Judy Dep., pp. 94-98).  Ketema's personal notes[12] generally reflect the difference of opinion between him and Judy. (1 PD 0261-0262).  Ketema basically accused Judy of lying to him about the incident. (Id.).

17.     Ketema performed his own investigation and confronted Judy the next day.  Of that meeting, Ketema wrote:

---

[11]The incident involved a mistake or violation of Midwest's makeup policy.  That policy allows an employee to submit a request in advance for time off which could be made up later in the week by working extra hours. (Judy Dep. 94-95).

[12]Ketema maintained journals of his activities the entire time he worked in the Sumter plant.  These journals, several thousand pages, were provided to defendants during discovery and Bates stamped.  Some of these are attached in support of Midwest's motion for summary judgment.  Interestingly, Ketema's journals contain "no references by plaintiff to any statements by Terry Judy that related to his feelings toward African-Americans." (McGrath Aff., ¶ 4).

-I told him that it was not appropriate for a shop supervisor and a plant manager to engage in such acts to deliberately undermine other senior staff.

-I told him that such behavior does not help teamwork.

-I also informed him that I will take the issue to Mrs. Thompson and Jerry (Hidalgo)

-He told me I could go to Mel [Rachal] or even Ron Thompson if I wanted to…I assured him that would not be necessary

-I informed him this favoritism will break up the team. (Id.).

18.    Ketema reported the dispute to C. Thompson and Hidalgo. (Pl. Dep. 7/16/03, p.

206).

19.    Ketema testified that after June of 2000 he was attacked by Judy "non-stop" and

that Judy was "making my life hell when I get to work." (Id. 206-207)

20.    In July of 2000, Ketema received a positive annual evaluation from Judy and C.

Thompson.  They stated in summary:

Mesfin is a valuable and integral member of the Sumter team.  His excellent work ethic and commitment to the company is greatly appreciated.  He is a highly capable, resourceful and effective Human Resources Manager.  His development is even more impressive because of the limited experience he had in the field of Human Resources, prior to joining the Sumter team.  With the growth plans for the Sumter plant, he has a wonderful opportunity to continue to hone his leadership and human resources skills.  We encourage Mesfin to pursue the Society Human Resource Management certification for the Professional or Senior Human Resources Manager.  We also need to discuss in more detail Mesfin's career objectives at Midwest Stamping and how we can support his continued growth and development.  Thank you for your contributions.  (C. Thompson Dep., Ex. 6).

21.    At that time, Ketema was given a 13.6% raise in pay. (Ex. 26, Att. 6).

22.    Another confrontation occurred between Ketema and Judy on October 26, 2001. At a meeting of managers, Judy announced implementation of a policy set by the corporate office which required written justification and approval for filling vacant positions. Ketema argued with Judy that he should not be required to justify filling a vacant position in the HR department due to its importance. At one point, Judy told Ketema to either justify the position pursuant to the policy or it would not be filled. (Judy Dep., pp. 92, 94; Pl. Dep. 7/16/03, p. 160 and Ex. 36).

23.    The next day, October 27, 2000, Ketema e-mailed C. Thompson asking her to visit the Sumter plant the next week because "(t)here are some serious issues that need to be addressed." (Pl. Dep. 7/16/03, Ex. 37).

24.    Ketema followed up with another e-mail later that day in which he discussed the meeting of October 26. He expressed the opinion that the management team was becoming dissatisfied with Judy's leadership and that "there are all the signs of dysfunctionality here at the present time." (Pl. Dep. 7/16/03, Ex. 38).

25.    Ketema notified Judy and the other managers by e-mail on October 31, 2000 that C. Thompson would be in Sumter the following week. (Pl. Dep. 7/16/03, Ex. 39).

26.    C. Thompson and Hidalgo visited Sumter to, *inter alia*, "address issues that Mesfin had raised about his working relationship with Terry Judy." (Ex. 26). C. Thompson summarized the meeting as follows:

> Since November of 2000, he [Ketema] was becoming more negative and argumentative working with others, in particular his direct supervisor, Terry Judy. Jerry Hidalgo, the Vice President [of] Manufacturing and I visited the Sumter plant together in November 2000 to address issues that Mesfin had raised about his working

> relationship with Terry Judy. The final result was that Mesfin was resentful of Terry Judy's request for information, that we (Jerry Hidalgo and Cynthia B. Thompson) felt as Plant Manager he had every right to request. I personally stressed to Mesfin, that no matter how sound he may be technically[,] an inability to work effectively with others was critical to successful job performance. Mesfin seemed to acknowledge and he and Terry Judy both agreed that they wanted to continue to work together and they had been successful for the past several years and could build on that success. (<u>Id</u>.)

27. Another flare up occurred on January 12, 2001. Ketema felt that Judy had side-stepped him in the development of a training program. (Pl. Dep. 7/16/03, Ex. 41 and 43).

28. Midwest posted a job opening for corporate human resource manager in March of 2001. (Pl. Dep. 7/16/03, Ex. 45). Ketema expressed interest in the position to C. Thompson. (C. Thompson Dep., p. 124).

29. At a staff meeting on April 4, 2001, Judy made a remark about Ketema's English which offended him. (Pl. Dep. 7/16/03, Ex. 47).

30. On April 4, 2001, Ketema sent Judy the following memo:

> I write this letter to express my extreme unhappiness and disappointment at the deliberate mistreatment and mismanagement you have subjected others and me over the last few months. I have repeatedly shared my concerns with you but that does not seem to matter. I can no longer continue to pretend everything is all right, nor can I tolerate being singled out from the senior management team for harassment.
>
> I am especially offended by your retaliatory conduct that is totally inconsistent with the values of Midwest Stamping. Your persistent pattern of playing members against each other and insistence on favoring friends has resulted in a very distrusting environment. Instead of addressing the issues that are brought to your attention, you have chosen to attack me. I have endured your intentional

attacks in front of and away from my colleagues over the last several months including the fabrication and misinformation to discredit me. I have tolerated your conscious attempts to exclude me from important issues that affect the plant, including associate development and other human resource matters. You have now started to micro-manage me in minutia knowing full well that it is the one thing that will de-motivate me. These are no longer acceptable to me. I have shown extreme restraint during this period and put a positive front for the well being of our plant.

I am still committed to Midwest Stamping and its core principles, one of which is treating people fairly and with respect. I sincerely hope you will re-assess your behavior in light of this principle and allow me to carry out my duties. I repeat, however, that under no circumstances will I compromise my integrity or the well being of a single associate to biases, prejudices, or retaliatory actions for non-conformance to nepotism. I sincerely hope that we can resolve these issues between us at the plant level.

(Pl. Dep. 7/16/03, Ex. 10).

31.     Judy responded to Ketema by e-mail (1) declining to address Ketema's individual concerns; (2) disagreeing with his opinions; (3) asking Ketema for "a detailed list of your expectations on how I should manage you and the HR aspects of this plant"; and (4) stating that Ketema's "ill-tempered outbursts that have been your past practice, will not be tolerated." (Pl. Dep. 7/16/03, Ex. 48).

32.     On or about April 17, 2001, C. Thompson informed Ketema by telephone that he would not be considered for the corporate HR position "due to events that had transpired over time" with the April 4 memo from Ketema to Judy being the "clincher." (Pl. Dep. 7/16/03, Ex. 52).

33.     Judy went to Ketema's office on April 24, 2001. At that point, Hidalgo had received a copy of Ketema's memo to Judy of April 4, 2001. Judy told Ketema

that they had "to be able to work out the issues." Judy was concerned about "negativity getting up to corporate." Ketema responded that he believed everything he had written in the letter and was unconcerned that Hidalgo had seen it. (Pl. Dep. 7/16/03, Ex. 54).

34.     Also on April 28, 2001, Ketema e-mailed Judy with suggestions on how to develop the budget for the coming fiscal year.[13]     Judy responded that "(y)ou have professionally presented your opinion on how you would like it to be and I respect that.  I disagree and intend to develop the budget the same way I have always done." (Pl. Dep. 7/16/03, Ex. 55).

35.     The record shows that over the next several weeks Ketema contacted C. Thompson and expressed his concerns about Judy.

36.     Ketema met with Judy on June 14, 2001, to discuss the presentation for a budget meeting to be held with Hidalgo the following week.  They again argued over the methodology of the budget preparation.  Finally, Judy told Ketema:

> I am the plant manager of this plant and I will manage it the way I feel it should be managed as long as it is legal and within company policy.  I know you disagree with that so if you can't get over it and accept the way it is, then just tell me now so we can plan how to

---

[13]The undersigned perceives the root of the conflict between Ketema and Judy to be a disagreement as to the management of the Sumter facility.  Ketema appears to believe that management was by a six member team including him and Judy with each member of the team having are equal vote. (See Doc. 26, p. 7).  Judy and corporate management recognized that, as plant manager, Judy had responsibility to make final decisions.  It appears that Ketema had difficulty accepting this concept.  As the undersigned understands the conflict over preparation of the budget, Ketema felt the budget should be developed in a team meeting with all team members having input, while Judy determined that he would meet individually with members to develop the plant's budget.

> transition you to your next opportunity.  I can't have a HR manager
> that is not be (sic) supportive.

Ketema responded that he would not support Judy's position and accused

Judy of threatening him. (Ex. 26, Att. 7, MK Journal 841).

37.     Later that afternoon, Judy and Ketema had another discussion.  Ketema indicated

that he would support Judy's decision, but continued to argue about the budget

process, and again accused Judy of threatening him and harassment. (Id.).

38.     Judy wrote a memorandum to Ketema's personnel file and copied Hidalgo and C.

Thompson. (Id.)

39.     On June 18, 2001, Ketema responded to the memorandum by handwritten notes in

the margins.  Ketema claimed retaliation by Judy together with "bias and prejudice

against different groups as well as himself." (Id., Ex. 26).

40.     On the same day, Ketema telephoned C. Thompson "to express [his] unhappiness

at the relentless harassment Terry has subjected me to." (MK Journal, p, 852).

41.     Next, Ketema left R. Thompson a voice mail expressing his unhappiness with

Judy's  "relentless attack." (Id.).

42.     C. Thompson came to Sumter to meet with Judy and Ketema on June 25, 2001.

Hidalgo participated for part of the meeting by telephone.  C. Thompson explained

that the allegations made by Ketema were serious and had to be investigated.

Ketema refused to give details of his allegations, and C. Thompson required him

to provide details by July 2, 2001. (Ex. 26).

43.     On July 2, 2001, Ketema responded with the Matrix. (Ex. 26, Att. 8-a).

14

44.    On July 12, 2001, Hidalgo and C. Thompson issued a memorandum to Ketema and Judy titled "Expectations for Terry Judy and Mesfin Ketema." This was an attempt to impose professionalism and bring the two together. (Ex. 26, Att. 9).

45.    C. Thompson investigated by talking with the employees identified in the Matrix on July 16-18, 2001. She also spoke with Judy and Ketema. (Ex. 26).

46.    Hidalgo and C. Thompson met with Judy and Ketema in Sumter on July 24, 2001. C. Thompson informed them that her investigation had shown that the "allegations of retaliation, bias, and prejudice taken separately or together were unfounded." She also stated that the "issues between Terry and Mesfin appear to be Mesfin's resentment of taking directions from Terry." (Id. and MK Journal, p. 953).

47.    Ketema met with C. Thompson and Rachal in Ohio on July 26, 2001. Rachal concluded that the poor relationship between Ketema and Judy "was a problem and that he would take a few weeks to determine what was best for the organization." (Ex. 26, Pl. 480-481).

48.    Ketema met personally with Rachal on August 10, 2001 with C. Thompson on the telephone. He was informed that he would have to leave Midwest. His notes from that meeting show:

- Option of resigning or termination
- Work through October
- Severance for Nov., Dec., Jan.
- Cobra coverage for those months
- Need to sign a severance form to be faxed to me on 8/12/01
- Provide my decision regarding resignation or termination by 8/17/01

Reason given: erosion of trust (MK Jour. 1000)

15

49. C. Thompson faxed Ketema the proposed separation agreement on August 12, 2001. (Ex. 26, Att. 5).  Ketema engaged an attorney to negotiate the terms of the agreement.

50. On August 16, 2001, Ketema informed Hidalgo that he had decided to resign. (Id.).

51. C. Thompson prepared a resignation notice that Ketema had resigned effective November 2, 2001. (Ex. 26, Att. 11).

52. The transition did not go smoothly.  During a conference call between Ketema and Judy in Sumter and Hidalgo and C. Thompson in Ohio, Ketema became upset, negative, and argumentative.  He walked out of the meeting. (Ex. 26).

53. On August 30, 2001, an employee named Carnell Dukes was sent home by Crawford.  He was ultimately terminated. (Judy Dep., pp. 184-86, C. Thompson Dep. Ex. 27).

54. On September 7, 2001, Ketema wrote a memorandum to C. Thompson discussing the Dukes situation. (C. Thompson Dep., Ex. 27).  In that memo, Ketema stated that Judy had made contradictory statements concerning the termination.  C. Thompson indicated on the memo that it was poorly written.  She further indicated that in a telephone discussion with Judy and Ketema about the termination, Ketema was "very argumentative…challenging…(and) negative." (Id.)

55. This apparently was the straw that broke the camel's back.  On the afternoon of September 11, 2001, C. Thompson informed Ketema that he was terminated immediately.  Her memorandum of the conversation states:

1.    Given the difficulties (most recently the negative interactions of yesterday re: Carnell Dukes termination) I have had working with him and the on-going difficulties that Terry has had, unfortunately, I do not believe that a smooth transition is possible. As such it is neither beneficial for him nor the company to continue.

2.    I told Mesfin that Terry and I agreed that his employment with MWS will end and he was terminated effective today. I was rescinding the separation agreement. The company will pay him through the end of the week and pay his COBRA through the end of the month of September 2001.

3.    Terry will allow him to get his personal belongings and escort him from the plant. I told Mesfin that he is not to come on company premises, unless it has been cleared in advance by Terry Judy.

56.    At approximately 2:00 a.m. on September 12, 2001, someone entered the Sumter plant using a "quick arm code" for the alarm system. (Reynolds Aff.) After the plant opened, Judy noticed that papers on Ketema's desk were in disarray and not as they had been left after Ketema's departure and at closing on September 11 (Judy Dep. 162).

57.    On September 14, 2001, Dorothy Levy sent the following e-mail to Baldwin:

What happen (sic) with Mesfin? If he was leaving in November, what happen (sic) for him to change and leave on Tuesday. Did it have anything to do with Attack of America?

Balwin replied from his home computer on September 16, 2001:

It wasn't his choice to leave to begin with. Then he pissed off Cynthia and he was asked to leave immediately. In the last month she found out what the real Mesfin was all about, finally. Probably a law suit. But I think he's one of them! (Baldwin Dep., p. 100 and Ex. 11).

17

58.    In October of 2001, Ketema filed a Charge of Discrimination with the South Carolina Human Affairs Commission alleging race and national origin discrimination as well as retaliation. He stated:

> I.    PERSONAL HARM
> A.    I was denied a promotion on or about April 15, 2001, to Corporate Human Resources Manager.
> B.    I was discharged on September 11, 2001.
> II.    RESPONDENT'S REASONS FOR THE ADVERSE ACTIONS
> A.    I was given no reason.
> B.    I was given no reason.
> III.    COMPLAINANT'S CONTENTIONS
> I contend that I was denied the promotion and discharged in retaliation for my complaints to management about the disparate treatment of blacks, including me. Management did nothing to correct the problems. Additionally, I was the only Ethiopian employee.
> IV.    DISCRIMINATION STATEMENT
> I therefore believe that I was discriminated against because of my race (black), national Origin (Ethiopian), and in retaliation for my opposition to employment practices made unlawful by the South Carolina Human Affairs Law, as amended, and Title VII of the United Sates Civil Rights Act of 1964, as amended.

## Discussion

1.    Disparate Treatment

Ketema alleges that Midwest did not promote him to the corporate HR position in April of 2001 and terminated him because of his race and/or national origin. Both claims are brought pursuant to Title VII.

Title VII makes it "an unlawful employment practice for an employer–(1) to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's

race…or national origin." In a disparate treatment case, the plaintiff must prove that "but for" his race or national origin, he would not have been subjected to an adverse employment action. Holmes v. Bevilacqua, 794 F.2d 142 (4th Cir. 1986). A plaintiff can prove the defendant's discriminatory motive by two methods. First, the "plaintiff may meet this burden under the ordinary standards of proof by direct and indirect evidence relevant to and sufficiently probative of the issue. In the alternative, a plaintiff may resort to the judicially created scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 729 (1973) and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981)." EEOC v. Clay Printing Company, 955 F.2d 936 (4th Cir. 1992).

The McDonnell-Douglas proof scheme consists of three stages. First, the plaintiff must produce sufficient evidence to establish a prima facie case of discrimination. Generally, the plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for his job and his job performance was satisfactory; (3) he was subjected to an adverse employment action; and (4) other employees who are not members of the protected class were treated more favorably. Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir.), cert. denied, 516 U.S. 870 (1995). If the plaintiff succeeds in submitting sufficient evidence to the Court to establish a prima facie case, the burden then shifts to the defendant to articulate a legitimate non-discriminatory reason for the employment action taken. Evans v. Tech. Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996). Once the defendant has satisfied its burden, it then shifts to plaintiff to prove that the proffered reason is merely a pretext for discrimination. Carter v. Ball, 33 F.3d 450, 458 (4th Cir. 1994).

A.     Promotion

Ketema asserts that he was denied promotion to the corporate HR manager's position in the Spring of 2001.

In order to establish a prima facie case of discriminatory failure to hire or promote, plaintiff is required to prove that:

1.     he is a member of a protected group;

2.     he applied for the position in question;

3.     he was qualified for the position; and

4.     he was rejected for the position in favor of someone not a member of a protected group under circumstances giving rise to an inference of unlawful discrimination.

Alvarado v. Board of Trustees of Montgomery Community College, 928 F.2d 118, 121 (4th Cir. 1991).  The burden of establishing a prima facie case is not an onerous one.  Texas Dep't of Community Affairs v. Burdine, 450 U.S. at 253.  Under the familiar burden-shifting framework of the analysis for Title VII actions, once the plaintiff carries the initial burden of proving a prima facie case, the employer bears the burden of articulating a legitimate, non-discriminatory reason for the challenged employment decision.  McDonnell Douglas, 411 U.S. at 802.  By providing such an explanation, the employer rebuts the presumption of discrimination created by the prima facie case, and the presumption "drops out of the picture," having "fulfilled its role of forcing defendant to come forward with some response."  St. Mary's Center v. Hicks, 509 U.S. 502, 510-11 (1993).  The plaintiff may then only prevail by persuading the factfinder that the employer's articulated reason was merely pretextual and that unlawful discrimination had a determinative

20

influence on the employer's decision. <u>Hazen Paper Company v. Biggins</u>, 507 U.S. 604, 610 (1993).

This three-step proof scheme has been adapted to motions for summary judgment. <u>Mitchell v. Data General Corporation</u>, 12 F.3d 1310, 1315-16 (4th Cir. 1993). When no genuine issue of any material fact exists, summary judgment is appropriate. <u>Shealy v. Winston</u>, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. <u>Id.</u> Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. <u>Ballinger v. North Carolina Agric. Extension Serv.</u>, 815 F.2d 1001, 1005 (4th Cir.), <u>cert. denied</u>, 484 U.S. 897 (1987). This does not mean that summary judgment is never appropriate in these cases. To the contrary, "'the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material fact</u>.'" <u>Id.</u> (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." <u>Ross v. Communications Satellite Corp.</u>, 759 F.2d 355, 364 (4th Cir. 1985).

In this case, Midwest "bears the initial burden of pointing to the absence of a genuine issue of material fact." <u>Temkin v. Frederick County Comm'rs</u>, 945 F.2d 716, 718 (4th Cir. 1991) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). If Midwest carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." <u>Id.</u> at 718-19 (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

21

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits [see Fed. R. Civ. P. 56(e)], depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. Baber, citing Celotex Corp., supra. Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data Gen. Corp., 12 F.3d at 1316 and DeLeon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1233 (4th Cir. 1989), n.7. Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Services Co., 875 F. Supp. 1115 (D.Md. 1995).

Midwest asserts that Ketema cannot establish a prima facie case of discrimination because he cannot show that he was qualified for the corporate HR position. (Def. Mem., p. 28). The first qualification in the announcement of the HR manager position states: "Seven years or more experience in all aspects of human resources." (Pl. Dep. 7/16/03, Ex. 45).[14] Ketema conceded during his deposition that he did not have the experience required by the announcement. (Pl. Dep.

---

[14]Other listed qualifications could be used to support Midwest's contention that Ketema was unqualified for the position. In addition to the experience requirement discussed above, the position announcement included qualifications of "tact and diplomacy" and "teamwork." (Pl. Dep. 7/16/03, Ex. 45).

7/16/03, Ex. 179).  Ketema has not directly responded to the argument that he did not qualify for the position, and therefore, he has not established a prima facie case of discrimination.

Midwest next argues that even if Ketema had established his prima facie case, he has failed to rebut its legitimate non-discriminatory reason for not promoting him.  C. Thompson summarized her reasons for not promoting Ketema in her SCHAC response (Ex. 26):

> On several occasions, Mesfin had shared with me his negative views about the Vice President Manufacturing, Vice President and Chief Engineer and the Organization Development Director.  My efforts to provide him an objective view on his negative perceptions were unsuccessful.  He expressed reservations about their support of Human Resources (HR) and believed at times they were interfering with the HR function.  I did not agree with his assessment and told him so more than once.
>
> At the end of several discussions with Mesfin[,] I told him that based on his negative perception of the people (corporate senior team staff) he would need to support and my belief that he and I would not work effectively together on a day-to-day basis, I would not consider him for the position of Corporate Human Resources Manager.  He seemed to understand the reasons I would not consider him for the Corporate Human Resources position.

Heretofore, to show pretext in a failure to promote case, a plaintiff "must establish that she was the better qualified candidate for the position sought."  Evans v. Techs. App. & Serv. Co. 80 F.3d 954, 960 (4th Cir. 1996).  In Dennis v. Colleton Medical Center, Inc., 290 F.3d 639 (4th Cir. 2002), the Fourth Circuit applied Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000) and held that a plaintiff may also rebut defendant's legitimate, non-discriminatory reason for failing to promote by showing that the reason proffered is false.  In all cases using the McDonnell Douglas framework "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against plaintiff remains at all time with the plaintiff." Murrell v. Ocean Mecca Motel, Inc., 262 F.3d 253, 257 (4th Cir. 2001).

23

Ketema has provided no evidence that he was better qualified than the individual who received the corporate HR position.  At his deposition, Ketema testified that he had no knowledge of her qualifications. (Pl. Dep. 7/16/03, p. 180).  Further, the record is replete with evidence that Ketema had trouble interacting with C. Thompson, Hidalgo, and Judy.  Importantly, Ketema's own handwritten notes corroborate this.  Although Ketema uses terms like discrimination, harassment, and retaliation, he has offered no evidence that his disagreements with his superiors was based on his race, national origin, or any other aspect of Title VII.  Thus, Ketema has not shown that C. Thompson's reasons for not promoting him quoted above are false.  This is underscored as to his race claim because the decision maker (C. Thompson) is also black.

Midwest also appears to assert that the "same actor doctrine" of Proud v. Stone, 945 F.2d 796 (4th Cir. 1991) precludes this claim.[15]  The Fourth Circuit found that "(f)rom the standpoint of the putative discriminator, it hardly makes sense to hire workers from a group one dislikes...only to fire them once they are on the job." (Id. at 797) (Internal quotations and citation omitted).  Midwest's argument on this point fails for two reasons.  First, the holding in Proud is limited to a situation where the termination closely follows the hiring–six months in the case of Proud. (Id.)  Ketema was denied promotion after working for Midwest in Sumter for over five years.  Second, it is entirely logical that an employer may hire a member of a protected group for a low level job and discriminate in promoting the employee to a higher level position.  The cases which have applied the "same actor doctrine" in the denial of promotion context appear to be limited to those cases where the individual who actually received the position was from the same

---

[15]This doctrine applies at the pretext stage of analysis.  Proud, 945 F.2d at 798.

24

protected group.  See for instance, <u>Islar v. Ourisman Chevrolet Co., Inc.</u>, 172 F.3d 44, 1999 WL 14120 (4th Cir. 1999) (Table) and <u>Cutshall v. Potter</u>, 347 F.Supp.2d 228 (W.D.N.C. 2004).  Midwest has not identified the person who received the corporate HR manager position.

      B.     Termination

         A variation of the <u>McDonnell Douglas</u> framework for a claim for failure to promote discussed above has been developed for discharge claims.  Here, Ketema asserts that he was terminated by Rachal in August of 2001 and was then terminated by C. Thompson on September 11, 2001, before his resignation became effective due to his race and national origin. In order to establish a prima facie case, Ketema must show that: (1) he is a member of a protected class; (2) he was terminated; (3) at the time of termination he was meeting his employer's legitimate expectations for his position; and (4) he was replaced by a similarly qualified individual from outside the protected class.  <u>King v. Rumsfeld</u>, 328 F.3d 145, 149 (4th Cir. 2003), <u>cert. denied</u>, 540 U.S. 1073 (2003).

     Midwest argues that Ketema cannot establish a prima facie case of discrimination because the record shows that he was not performing to Midwest's legitimate expectations at the times of discharge and with respect to his race claim he was replaced by someone within the protected class.[16]

---

[16]Midwest states that Ketema was replaced by Marrick Walters, an African-American. (Def. Mem. p. 30).  There is no citation to the record concerning this assertion.  However, Ketema has not contested this point and has offered no evidence that he was replaced by someone outside the protected class.  Therefore, the undersigned concludes that Ketema has failed to establish a prima facie case of race discrimination on this basis.  The following discussion of Ketema's performance will apply to both claims, i.e., race and national origin.

To establish a prima facie case of discriminatory termination, a plaintiff must show that at the time of discharge "he was performing at a level that **met his employer's legitimate expectations**." (Id.) (Emphasis added).  In other words, it is the employer's perception of the employee's job performance that is determinative.  The employee's opinion is largely irrelevant.  Likewise, the opinions of co-workers, customers, and the like are also of like import.  Absent a concession by the employer as to the employee's job performance, the employee can prove this element by introducing a series of positive performance appraisals or offering testimony from a qualified expert as to legitimate job performance expectations and analysis of the employee's performance with respect to those expectations. (Id. at 149-50).

The undersigned concludes that Ketema has met his burden of establishing a prima facie case based on his performance appraisals.  Only his last one is in the record.  Ketema's summary of his prior appraisals is inadmissible, but Midwest does not appear to assert that Ketema was judged deficient in his previous evaluations.

Alternatively, Midwest suggests that even if Ketema has established a prima facie case, it is still entitled to summary judgment because it has proffered a legitimate non-discriminatory reason for its action which Ketema has failed to rebut.  As recounted in detail above, after investigation, discussion, and counseling Midwest came to the corporate conclusion that the rift between Ketema and Judy had widened to the point that it was irreparable.  Ketema's notes reflect the rift.

It also must be understood that Ketema held a sensitive managerial position and that a loss of confidence was critical.  Courts generally hold that supervisors and management employees may be held to a higher standard than lower level employees.  See Chamberlin v. Bissell, Inc., 547

F.Supp. 1067, 1078 (W.D. Mich. 1982) (Employer acted "within its legitimate prerogative in requiring higher performance standards for management personnel and the fact that it will tolerate managerial performance in non-management positions does not create a duty to tolerate such performance among its executives…[I]t was [plaintiff's] insolence and lack of cooperation that were the root causes of his poor performance."); Garrett v. Parke, Davis & Co., 1985 WL 8053, *3 (D.S.C. 1985) (unpublished) (Supervisor has duty "to cooperate with and to support management…Plaintiff was not discharged because of her performance; it was her belligerent refusal to correct her performance deficiencies and her insubordinate reaction to the review that caused her discharge."); Miller v. U.S.F. & G., 1994 WL 395718, *5 (D.Md. 1994) (Human Resources Manager held to higher standard than manager of defendant's Agency and Development department); Castleberry v. Boeing Co., 880 F.Supp. 1435, 1441 (D.Kan. 1995) ("[A]n employer may expect a higher level of conduct from management as compared to nonmanagement personnel""); and McKnight v. Super America Group/Ashland Oil Co., 888 F.Supp. 1467, 1483 (E.D.Wis. 1995) ("[A] manager sets the standard of conduct to which other employees are to adhere…[H]is conduct could rightfully be subjected to a higher degree of scrutiny").

The court in Miller v. U.S.F. & G., supra, faced a similar situation.  In that case, a Human Resources Manager established a prima facie case that she was discharged due to her gender based on her prior performance appraisals.  The court found that a sudden loss of confidence subsequent to the appraisals formed a legitimate, non-discriminatory reason for termination.  The court stated:

> Finally, Miller's effort to undermine U.S.F. & G.'s assessment of her performance by pointing to her previous evaluations fails to appreciate that her behavior in January 1992 was, according to U.S.F. & G., the basis for

27

her dismissal; any previous professional accomplishments are irrelevant. A court must measure an employer's performance expectations "as of the time the employee is discharged." <u>Grohs v. Gold Bond Building Products</u>, <u>Div. of Nat. Gypsum Co.</u>, 859 F.2d 1283, 1287 (7th Cir.1988), <u>cert.</u> <u>denied</u>, 490 U.S. 1036 (1989). "Prior good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual. To hold otherwise would be to hold that things never change, a proposition clearly without basis in reality." <u>Billet v. Cigna Corp.</u>, 940 F.2d 812, 826 (3rd Cir.1991).

<u>Miller v. U.S.F. & G.</u>, <u>supra</u>

The undersigned concludes that Ketema has failed to show that the reasons given for his termination are a pretext for discrimination.

2.      Retaliation

Title VII prohibits an employer from retaliating against an employee.  Title 42 U.S.C. § 2000e-3(a) makes it unlawful "for an employer to discriminate against any of his employees…because [the employee] has opposed any practice made an unlawful practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."

Under the <u>McDonnell Doulgas</u> framework, a plaintiff can establish a prima facie case of retaliation by showing: (1) he engaged in protected activity; (2) the employer took some adverse employment action against the employee; and (3) a causal connection existed between the protected activity and the adverse action.  <u>Price v. Thompson</u>, 380 F.3d 209, 212 (4th Cir. 2004); <u>King v. Rumsfeld</u>, 328 F.3d at 149; and <u>Von Guten v. Maryland</u>, 243 F.3d 858, 863 (4th Cir. 2001).  If the plaintiff is able to establish a prima facie case, the burden shifts to the defendant to set forth a legitimate non-retaliatory reason for the action.  Plaintiff must then show that the employer's proffered reason is pretextual by showing that the "explanation is 'unworthy of credence' or by

28

offering other forms of circumstantial evidence sufficiently probative of [retaliation]." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (quoting Texas Dept. of County Affairs v. Burdine, 450 U.S. 248, 256 (1981).

Ketema asserts that Midwest retaliated against him by failing to promote him and terminating him because he opposed its discriminatory practices (Complaint, ¶ 53). Midwest appears to argue that Ketema cannot establish a prima facie case because he has not shown that he engaged in a protected activity.

An employee who "oppose(s) any practice made an unlawful employment practice by [Title VII]" has engaged in a protected activity. 42 U.S.C. § 2000e-3(a). Protected "(o)pposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinion in order to bring attention to an employer's discriminatory activities." Kubicko v. Ogden Logistics Servs., 181 F.3d 544, 551 (4th Cir. 1999) (internal quotation marks omitted). A plaintiff need not demonstrate that the employer has actually violated Title VII; rather, the plaintiff must show that "he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring." Peters v. Jenny, 327 F.3d 307, 320 (4th Cir. 2003) (internal quotation marks omitted).

Ketema has not clearly identified any practice made unlawful which he specifically opposed. Surely one of the functions of a human resources manager is to deal with employer-employee relations and to defuse situations in which employees are upset with the company or its management including allegations involving Title VII violations. The undersigned does not conclude that Ketema engaged in a protected activity because he was involved in such matters as Midwest's HR manager. Most of Ketema's complaints concern "attacks," "harassment" and

"retaliation" by Judy.    However as discussed above, Ketema testified that Judy never discriminated against him due to his race or national origin.    Therefore, the undersigned concludes that Ketema's complaints about Judy, made to Judy, C. Thompson, Hidalgo, and others do not constitute protected activity.    As the undersigned reads the record in this case, the first time Ketema accused management of Title VII discriminatory practices was when he presented the Matrix to C. Thompson in July of 2001.[17]    However, because of Ketema's position, the undersigned finds that this is not protected activity.

Assuming Ketema's sending the Matrix to C. Thompson constituted a protected activity, the only adverse action taken after that time was Ketema's termination.    The promotion had been denied prior to that time.    Therefore, the undersigned concludes that Ketema has not established a prima facie case of retaliation with respect to Midwest's failure to promote him to the corporate HR position.    Further, Ketema has not shown a causal connection between the Matrix and his eventual termination.

In any event, as discussed in detail above, Midwest has articulated a legitimate, non-retaliatory reason for its actions.    Ketema has not shown pretext.    Therefore, his retaliation claim fails.

3.    State Law Claims

Ketema asserts claims under South Carolina law against Midwest for breach of contract and breach of an implied covenant of good faith and fair dealing.    These claims are

---

[17]Of all the alleged incidents contained in the Matrix, only two appear to raise Title VII concerns: a 1997 isolated racial slur and Ricza Harris' feeling that her desk was moved after she filed a sexual harassment complaint.

premised on Ketema's assertion that Midwest's employee handbook altered his status as an at-will employee.[18]  Additionally, Ketema asserts a claim for defamation against Judy, C. Thompson, and Baldwin.

      a.    Contract Claims[19]

Ketema asserts that the employee handbook which he received altered his status as an at-will employee.  He specifically references language contained in the progressive discipline section of the handbook and Midwest's mission statement contained in the handbook.[20]  Midwest argues that the handbook did not alter Ketema's at-will status because it contains a conspicuous disclaimer sufficient under South Carolina law and that the language relied on by Ketema is permissive and not mandatory.  Ketema has not directly responded to these arguments.

South Carolina has long recognized the doctrine of employment at-will.  Pursuant to this doctrine, "a contract for permanent employment, so long as it is satisfactorily performed, which is not supported by any consideration other than the obligation or service to be performed on the

---

[18]Ketema makes no claim that his negotiations for severance resulted in a contract that was breached when he was terminated on September 11, 2001.

[19]Ketema's claim for breach of an implied covenant of good faith and fair dealing is directly related to his breach of contract claim.  He asserts that the implied covenant arises from the language of the handbook.  Midwest argues that the "implied covenant of good faith and fair dealing is not an independent cause of action separate from the claim for breach of contract" citing RoTec Services, Inc. v. Encompass Services, Inc., 597 S.E.2d 881, 884 (S.C.Ct. App. 2004).  See also, In re Ducane Gas Grills, Inc., 320 B.R. 341, 354 (D.S.C. 2004).  These cases do not deal with "employee handbook" contracts.  However, the undersigned sees no reason why this rationale should not apply to such cases.  Therefore, the undersigned recommends that summary judgment be granted with respect to Ketema's claim for breach of the implied covenant of good faith and fair dealing arising from the handbook.

[20]A copy of the handbook is in the record before the Court.  See Ex. 26, Att. 12 and Pl. Dep., Ex. 63.

31

one hand and wages to be paid on the other, is terminable at the pleasure of either party." <u>Shealy v. Fowler</u>, 188 S.E. 499, 502 (S.C. 1936). Under South Carolina law, an at-will employee may be terminated for any reason or for no reason at all. <u>Ludwick v. This Minute of Carolina, Inc.</u>, 337 S.E.2d 213 (S.C. 1985). Under South Carolina law, employment-at-will status can be altered by promises made to an employee in policies, employee handbooks, and employee bulletins. <u>Small v. Springs Industries</u>, 357 S.E.2d 452 (S.C. 1987). An employer who wishes to issue a handbook as an advisory statement with no intent on being bound by it must "insert[] a conspicuous disclaimer or provision into the written document." <u>Springs</u>, 357 S.E.2d at 454-55.

Section A of the handbook is an "Introduction." The first page of the Introduction section, page A-1, is entitled "Purpose." This single page contains the following language in bold print:

> Nothing contained herein shall be construed as a guarantee of continued employment or as a contract for employment. Neither you nor the Company is bound to continue the employment relationship if either chooses at its will, to end the relationship at any time.

Page A-4 of the Introduction contains Midwest's Mission statement:

> The Mission of MIDWEST STAMPING COMPANY is to satisfy its customers' expectations as a world-class supplier of stampings and assemblies while earning a fair and reasonable profit.
>
> In pursuant of this Mission, MIDWEST STAMPING COMPANY will maintain a culture in which employees (associates), customers, vendors, and neighbors are treated fairly, and with respect.
>
> MIDWEST STAMPING COMPANY will work with its employees (associates) to develop their potential and involve them fully in the workplace. MIDWEST STAMPING COMPANY will promote an environment in which change is embraced and planned for, teamwork is encouraged and supported, and the needs of the employees (associates) are addressed.

32

Section E of the handbook discusses "General Information." The progressive discipline policy is contained in the "Appropriate Conduct" portion of this section at pages E-11 through E-13. Finally, the "Appropriate Conduct" section ends with a "Termination of Employment" discussion.

> The Company does not guarantee continued employment and retains the right to terminate associates due to adverse business conditions, performance, change of business situation, or any other reason not contrary to federal, state, or local law. Associates also have the right to terminate employment at any time, but are required to give at least two (2) weeks written notice of their intention to do so. Managers or supervisors are required to give three (3) weeks written notice. Associates that do not give the company the required written notice will forfeit unpaid vacation time. Please note that vacation leave does not count towards the required notice.

> Nothing contained in this handbook shall be construed as a guarantee of continued employment or as a contract for employment. Neither the Company nor the associate is bound to continue the employment relationship if either chooses at its will, to end the relationship at any time.

Review of the handbook shows that Midwest inserted a conspicuous disclaimer. Here, the disclaimer was stated on page A-1 of the handbook in bold print. The disclaimer was repeated, although not in bold print, at the end of the handbook. Page A-1 is sufficient to call notice to it.[21] Tolley v. Health Care and Ret. Corp., Inc., 133 F.3d 917, 1998 WL 24972 *5 (4th Cir. 1998)(finding that a disclaimer was conspicuous where it was on a separate page that was meant to be severed and signed by employee and in fact was signed); Taliaferro v. Associates Corp. of North America, 112 F.Supp.2d 483 (D.S.C. 1999), aff'd, 229 F.3d 1144 (4th Cir. 2000); Marr v. City of Columbia, 416 S.E.2d 615 (S.C. 1992) (disclaimer found to be conspicuous where it was placed in large letters on the front cover of employee handbook, and then repeated in large

---

[21]Ketema testified that he read the handbook and knew about the disclaimer. Pl. Dep. 10/24/04. Thus, he has actual knowledge of the disclaimer.

bold type on a separate page of the handbook); <u>Kumpf v. United Tel. Co. of the Carolinas</u>, 429 S.E.2d 869 (S.C. Ct.App.1993) (disclaimer located on the last page in the "conclusion" section of the employee handbook was not conspicuous where it was not capitalized, bolded, set apart with distinctive border, or in contrasting type or color). <u>Hannah v. United Refrigerated Servs., Inc.</u>, 430 S.E.2d 539 (S.C. Ct.App.1993), (Disclaimer in the manual's "Welcome" section, which was not otherwise set off, was not conspicuous. "The test for conspicuousness is whether there is something about the provision that reasonably calls attention to it. If the disclaimer is not capitalized, in bold lettering, set apart with a distinctive border, or in some other way set off from the general text, the disclaimer is ineffectual.").

However, the insertion of an effective disclaimer is not the end of the analysis. An employee handbook with a conspicuous disclaimer may, nonetheless, alter an employee's at-will status where the handbook also includes mandatory language with respect to certain procedures. the handbook must be reviewed in its entirety to ascertain whether it contains enforceable promises.

In the exception to the at-will employment doctrine, an employee handbook containing mandatory statements regarding disciplinary and grievance policies may be enforced against an employer as contractual obligations in a wrongful discharge action, despite the presence of a disclaimer in the handbook which asserts it is not intended to create a contract of employment. <u>Conner v. City of Forest Acres</u>, 560 S.E.2d 606, 610-611 (S.C. 2002); <u>Fleming v. Borden, Inc.</u>, 450 S.E.2d 589, 594-96 (S.C. 1994); <u>Small v. Springs Indus., Inc.</u>, 357 S.E.2d 452 (S.C. 1987).

Generally, where a handbook contains an effective disclaimer and some mandatory language but enforcement is left to the discretion of management, there is no alteration of the

34

employee's at-will status. See <u>Horton v. Darby Electric Co., Inc</u>., 360 S.C. 58, 599 S.E.2d 456 (S.Ct. 2004) (affirming grant of summary judgment).

The "Appropriate Conduct" section of the handbook uses some mandatory language with respect to "Conduct Which May Result In Immediate Discharge" and with respect to "less serious misconduct" to which progressive discipline might apply. (Handbook, p. E-12 through E-14). However, in both instances, the mandatory language is modified and tempered by corresponding permissive language giving decision makers virtually unfettered discretion.

The undersigned concludes that Ketema has failed to show that the handbook altered his status as an at-will employee. Further, Ketema was essentially granted all the steps called for if the policy applied. He was given the opportunity to defend his actions, his complaints were investigated, he was counseled by the corporate HR manager (C. Thompson) and the president (Rachal), he was given the opportunity to improve his attitude and conduct, and he was given written notice.

b.    Defamation

Ketema alleges that he was defamed by Judy, C. Thompson, and Baldwin because they made statements that: (1) he entered the Midwest facility without authorization after he was terminated; (2) he stole or embezzled Midwest property; (3) he did not properly perform his duties; and (4) he was a terrorist. Ketema does not appear to assert a defamation claim against Midwest.[22]

---

[22]Ketema did assert a defamation claim against Kim Belser, an employee at Midwest. However, she has been dismissed as a defendant.

Under South Carolina law, the tort of defamation provides redress for an injury to reputation due to the defendant's communication to others of a false statement about plaintiff. The elements are: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. Fleming v. Rose, 526 S.E.2d 732 (S.C.Ct. App. 2000), *rev'd on diff. grounds*, 567 S.E.2d 857 (2002).

Initially, it must be noted that Ketema has produced little evidence, except as discussed below, that Judy, C. Thompson, and Baldwin published statements about which he complains. These claims are based in large measure on rumors which circulated through the plant after Ketema was released and the "break in" occurred. After the break in, the hourly employees were aware that the locks were changed apparently energizing the rumor mill. See Kershaw Dep., 33-39; Belser Dep., 25-26, 87; and Tobin Aff., ¶ 14.

Ketema appears to allege that he was defamed by Judy and C. Thompson because they accused him of entering the plant without permission after he was terminated. There is ample evidence, as discussed above, that someone entered the plant using a special code. Not surprisingly, Judy conveyed his suspicions to C. Thompson that Ketema was the culprit. (Judy Dep., 163-64). C. Thompson received the information, and it was discussed by Midwest management. There is no evidence that the suspicion was shared with anyone outside Midwest. (C. Thompson Dep., 176-77).

Defendants assert that they are entitled to a qualified privilege concerning their statements about Ketema following the break in. The South Carolina Supreme Court summarized this issue in <u>Swinton Creek Nursery v. Edisto Farm Credit</u>, 514 S.E.2d 126 (S.C. 1999).

> In a defamation action, the defendant may assert the affirmative defense of conditional or qualified privilege. Under this defense, one who publishes defamatory matter concerning another is not liable for the publication if (1) the matter is published upon an occasion that makes it conditionally privileged, and (2) the privilege is not abused. Restatement (Second) of Torts § 593 (1977); see <u>Bell v. Bank of Abbeville</u>, 208 S.C. 490, 38 S.E.2d 641 (1946). In <u>Bell</u>, this Court held:
>
>> In determining whether or not the communication was qualifiedly privileged, regard must be had to the occasion and to the relationship of the parties. When one has an interest in the subject matter of a communication, and the person (or persons) to whom it is made has a corresponding interest, every communication honestly made, in order to protect such common interest, is privileged by reason of the occasion. The statement, however, must be such as the occasion warrants, and must be made in good faith to protect the interests of the one who makes it and the persons to whom it is addressed. <u>Bell</u>, 208 S.C. at 493-94, 38 S.E.2d at 643…..
>
> In general, the question whether an occasion gives rise to a qualified or conditional privilege is one of law for the court. 50 Am.Jur.2d Libel and Slander § 276 (1995). However, the question whether the privilege has been abused is one for the jury. <u>Id</u>. Factual inquiries, such as whether the defendants acted in good faith in making the statement, whether the scope of the statement was properly limited in its scope, and whether the statement was sent only to the proper parties, are generally left in the hands of the jury to determine whether the privilege was abused. <u>Id</u>.; <u>see</u> <u>also</u> Restatement (Second) of Torts §§ 599-610. In <u>Fulton [v. Atlantic Coast Line R.R.</u>, 220 S.C. 287, 67 S.E.2d 425 (1951) ], this Court held that it was a question for the jury to determine if the publication went beyond what the occasion required and was unnecessarily defamatory. <u>Fulton</u>, 220 S.C. at 297, 67 S.E.2d at 429; cf. <u>Woodward</u>, 277 S.C. at 32-33, 282 S.E.2d at 601 ("While abuse of privilege is ordinarily an issue for the jury, … in the absence of a controversy as to the facts … it is for the court to say in a given instance whether or not the privilege has been abused or exceeded.").

The defendant must establish that it made a communication in good faith on a subject in which it has an interest or duty to a person with a corresponding interest or duty. <u>Constant v. Spartanburg Steel Prods, Inc</u>., 447 S.E.2d 194 (S.C. 1994). Here, defendants have established a common interest in the subject as they were attempting to protect the interest of Midwest. Generally, communications between corporate officers and employees are granted qualified immunity if they are made in good faith and in the usual course of business. <u>Conwell v. Spur Oil Co.</u>, 125 S.E.2d 270, 275 (S.C. 1962). Ketema has offered no proof or argument that defendants abused the privilege.

Ketema appears to assert that he was defamed by Baldwin who sent the e-mail implying that Ketema was a terrorist connected with the attack of September 11, 2001. Baldwin has filed no motion for summary judgment, so this claim should survive. It is recommended that the motion of Baldwin's attorney to be relieved be granted and that the defamation claim against Baldwin be dismissed pursuant to 28 U.S.C. § 1367(c)(3). Further, if the court finds that the state claims against Midwest, Judy and C. Thompson should survive summary judgment, it is alternatively recommended that they also be dismissed pursuant to § 1367(c)(3).

<u>Conclusion</u>

Based on a review of the record, it is recommended that the motion for summary judgment of Midwest, Judy and C. Thompson be granted. It is further recommended that the defamation claim against Baldwin be dismissed and that his attorney's motion to be relieved be granted.

Respectfully submitted,

s/Joseph R. McCrorey
United States Magistrate Judge

June 17, 2005
Columbia, South Carolina

**The parties' attention is directed to the important information on the attached notice.**

38

**Notice of Right to File Objections to Magistrate Judge's Report and Recommendation**
**&**
**The Serious Consequences of a Failure to Do So**

The parties are hereby notified that any objections to the attached Report and Recommendation (or Order and Recommendation) must be filed within ten (10) days of the date of its filing.  28 U.S.C. § 636 and Fed. R. Civ. P. 72(b).  The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three days for filing by mail.  Fed. R. Civ. P. 6.  Based thereon, this Report and Recommendation, any objections thereto, and the case file will be delivered to a United States District Judge fourteen (14) days after this Report and Recommendation is filed.  Advance Coating Technology, Inc. v. LEP Chemical, Ltd., 142 F.R.D. 91, 94 & n. 3 (S.D.N.Y. 1992).  A magistrate judge makes only a recommendation, and the authority to make a final determination in this case rests with the United States District Judge.  See Mathews v. Weber, 423 U.S. 261, 270-271 (1976); and Estrada v. Witkowski, 816 F. Supp. 408, 410 (D.S.C. 1993).

During the ten-day period, but not thereafter, a party must file with the Clerk of Court specific, written objections to the Report and Recommendation, if he wishes the United States District Judge to consider any objections.  Any written objections must *specifically identify* the portions of the Report and Recommendation to which objections are made *and* the basis for such objections.  Failure to file written objections shall constitute a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the United States District Judge.  See United States v. Schronce, 727 F.2d 91, 94 & n. 4 (4th Cir.), *cert. denied*, Schronce v. United States, 467 U.S. 1208 (1984); and Wright v. Collins, 766 F.2d 841, 845-47 & nn. 1-3 (4th Cir. 1985).  Moreover, if a party files specific objections to a portion of a magistrate judge's Report and Recommendation, but does not file specific objections to other portions of the Report and Recommendation, that party waives appellate review of the portions of the magistrate judge's Report and Recommendation to which he did not object.  In other words, a party's failure to object to one issue in a magistrate judge's Report and Recommendation precludes that party from subsequently raising that issue on appeal, even if objections are filed on other issues.  Howard v. Secretary of HHS, 932 F.2d 505, 508-509 (6th Cir. 1991).  See also Praylow v. Martin, 761 F.2d 179, 180 n. 1 (4th Cir.)(party precluded from raising on appeal factual issue to which it did not object in the district court), *cert. denied*, 474 U.S. 1009 (1985).  In Howard, supra, the Court stated that general, non-specific objections are *not* sufficient:

> A general objection to the entirety of the [magistrate judge's] report has the same effects as would a failure to object.  The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the [magistrate judge] useless.  * * * This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act.  * * * We would hardly countenance an appellant's brief simply objecting to the district court's determination without explaining the source of the error.

*Accord* Lockert v. Faulkner, 843 F.2d 1015, 1017-19 (7th Cir. 1988), where the Court held that the appellant, who proceeded *pro se* in the district court, was barred from raising issues on appeal that he did not specifically raise in his objections to the district court:

> Just as a complaint stating only 'I complain' states no claim, an objection stating only 'I object' preserves no issue for review.  * * * A district judge should not have to guess what arguments an objecting party depends on when reviewing a [magistrate judge's] report.

See also Branch v. Martin, 886 F.2d 1043, 1046 (8th Cir. 1989)("no de novo review if objections are untimely or general"), which involved a *pro se* litigant; and Goney v. Clark, 749 F.2d 5, 7 n. 1 (3rd. Cir. 1984)("plaintiff's objections lacked the specificity to trigger *de novo* review").  This notice, hereby, apprises the parties of the consequences of a failure to file specific, written objections.  See Wright, supra,; and Small v. Secretary of HHS, 892 F.2d 15, 16 (2nd Cir. 1989).  Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing addressed as follows:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201